UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRENE KRISTAL, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MESOBLAST LIMITED, SILVIU ITESCU, JOSH MUNTNER, and FRED GROSSMAN,<br><br>Defendants. | **CASE No.: 7:20-CV-08430-PMH**<br><br>**CLASS ACTION**<br><br>Honorable Philip M. Halpern |

**DECLARATION OF SARA FUKS IN SUPPORT OF: (I) PLAINTIFFS'
UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF
ALLOCATION AND FINAL CERTIFICATION OF THE SETTLEMENT CLASS; AND
(II) LEAD COUNSEL'S UNOPPOSED MOTION FOR AWARD OF ATTORNEYS'
<u>FEES AND REIMBURSEMENT OF LITIGATION EXPENSES</u>**

## TABLE OF EXHIBITS

**Exhibit 1:**       Declaration of Josephine Bravata

**Exhibit 2:**       Excerpts from NERA Report

**Exhibit 3:**       Declaration of Gary Feess

**Exhibit 4:**       Chart of Peer Billing Rates

**Exhibit 5:**       The Rosen Law Firm, P.A.'s Firm Resume

**Exhibit 6:**       Declaration of Frank Fayz

**Exhibit 7:**       Declaration of David Caudle

I, Sara E. Fuks, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1.      I am a partner at The Rosen Law Firm, P.A. ("Rosen Law" or "Lead Counsel"), Court-appointed Lead Counsel for Lead Plaintiff Frank Fayz and Named Plaintiff David Caudle ("Plaintiffs") in above-captioned action (the "Action").[1] I have personal knowledge of the facts asserted herein based on my active participation in the prosecution of this Action and settlement of the claims asserted therein. If called upon, I could and would competently testify that the following facts are true and correct.

2.      I respectfully submit this declaration, together with the attached exhibits, in support of the Plaintiffs' Unopposed Motion for Final Approval of Settlement and Plan of Allocation and Final Certification of the Settlement Class, and the concurrently filed memorandum in support thereof ("Final Approval Memorandum"). As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $2,000,000 Settlement for the benefit of the Settlement Class, final approval of the Proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members, and final certification of the Settlement Class.[2]

3.      I also respectfully submit this declaration and its exhibits in support of Lead Counsel's Unopposed Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof (the "Fee Memorandum").

---

[1] All capitalized terms used herein that are not otherwise defined herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement (the "Stipulation") filed with the Court on March 28, 2022 (ECF No. 70).

[2] Subject to certain exclusions, the Settlement Class consists of all persons and entities who purchased or otherwise acquired Mesoblast Limited ("Mesoblast" or the "Company") publicly traded American Depository Shares ("ADSs") between December 13, 2018 and October 2, 2020, inclusive, and who held such shares on August 11, 2020, and/or October 2, 2020, and who were damaged thereby.

1

As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of one-third ($33^{1/}3\%$) of the Settlement Fund, or $666,667, (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $22,670.50. Lead Counsel also respectfully requests a total award of $2,000 to Plaintiffs ($1,000 to Lead Plaintiff Frank Fayz and $1,000 to Named Plaintiff David Caudle) pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs incurred in connection with their representation of the Settlement Class.

4.    The Court preliminarily approved the Settlement by order dated April 8, 2022 ("Preliminary Approval Order") and thereby directed notice of the Settlement to be disseminated to the Settlement Class. (ECF No. 75). Pursuant to the Preliminary Approval Order, Strategic Claim Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication. *See* Sec. IV, *infra* (detailing notice program); *see also* Ex. 1 (Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections, the "Bravata Decl." ¶¶2-11).

5.    In total, 51,130 potential Settlement Class Members were notified of the Settlement by Postcard Notice (referring Settlement Class Members to the Settlement Website where the longform Notice and the Claim Form are posted) or emailed direct links to the Notice and Claim Form. Of this number, 29,398 Postcard Notices were mailed and a nominee emailed 21,732 clients a link of the Notice and Claim Form. To date there have been no objections and only one purported request for exclusion has been received. Ex. 1 (Bravata Decl. ¶¶6, 7, 8,14, 15).

## I.    INTRODUCTION

6.    This is a federal securities class action for violations of Sections 10(b) and 20(a) of

2

the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), against defendants Mesoblast, Silviu Itescu, Josh Muntner, and Fred Grossman (the "Individual Defendants," and together with Mesoblast, "Defendants").

7.    On August 13, 2021, Plaintiffs filed and the Amended Class Action Complaint for Violations of Federal Securities Laws (the "Amended Complaint" or "Complaint") (ECF No. 51). Specifically, the Complaint alleges that Defendants made materially false and misleading statements and material omissions concerning Mesoblast's Biologics License Application ("BLA") and clinical trial for remestemcel-L ("The Trial" or "MSB-GVHD0001") to treat pediatric patients with steroid-refractory acute graft-versus-host disease ("aGVHD"). Plaintiffs allege that the prices of Mesoblast's ADSs were artificially inflated as a result of Defendants' allegedly false and misleading statements and material omissions, and declined when the truth was revealed.

8.    The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $2,000,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents a highly favorable result for the Settlement Class considering the posture of the Action, as well as the significant risks to overcome remaining in the Action. Indeed, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

9.    The $2,000,000 non-reversionary all-cash recovery is also well within the range of reasonableness under the circumstances to warrant final approval of the Settlement. Plaintiffs' damages expert estimates that if Plaintiffs had fully prevailed on their claims at both summary

3

judgment and after a jury trial, if the Court certified the Class, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' best-case scenario—the $2,000,000 Settlement Amount represents between 2.7% and 3.7% of the total ***maximum*** damages ***potentially*** available in this Action. Conversely, if Defendants prevailed on their liability arguments, or if their anticipated loss causation arguments were accepted, damages would be eliminated or drastically reduced.

10.    A recovery that is significantly above the 1.8% median settlement for securities litigation matters is well-within the range of reasonableness. *See, e.g.*, Ex. 2 (excerpt of Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) ("NERA Report") at p. 24, Fig. 22 (median recovery in securities class actions in 2021 was approximately 1.8% of estimated damages). Consequently, the amount Plaintiffs recovered, when balanced against the risks of continued litigation, weighs strongly in favor of final approval.

11.    The proposed Settlement is the result Lead Counsel's significant efforts, which included, among other things detailed herein: (a) conducting an extensive investigation of the claims asserted in the Action, including a detailed review of Mesoblast's public filings with the Securities and Exchange Commission ("SEC"), press releases, analyst reports, news reports, Food and Drug Administration ("FDA") briefing documents, and other public information regarding the Company, and consultation with experts in the fields of damages and FDA submissions; (b) researching and preparing the Amended Complaint based on Lead Counsel's investigation; (c) opposing Defendants' pre-motion letter and attending the pre-motion to dismiss conference; (d) participating in the mediation and drafting a mediation statement; (e) drafting the stipulation and related settlement documents; (f) working with a damages consultant to prepare the proposed Plan

of Allocation; and (g) supervising a comprehensive notice program.

12.    Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

13.    In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages consultant. Sec. V., *infra* (discussing Plan of Allocation). The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

14.    Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum.  As discussed in detail in the Fee Memorandum, the requested one-third fee is well within the range of percentage awards granted by courts in this Circuit in comparable securities class actions.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested out-of-pocket litigation costs of $22,670.50 and the requested PSLRA awards totaling $2,000 for Plaintiffs are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

15.    Plaintiffs allege that between December 13, 2018 and October 2, 2020, inclusive (the "Settlement Class Period"), Defendants made materially false and misleading statements and omitted material information concerning Mesoblast's BLA and pivotal clinical trial for remestemcel-L to treat pediatric patients with aGVHD.

16.    Specifically, the Amended Complaint alleges that during the Settlement Class Period, Defendants misled investors into believing that the Trial would support FDA approval of the Company's BLA for remestemcel-L. However, Plaintiffs allege that unbeknownst to investors, Defendants were aware that flaws in the Trial's design substantially diminished the likelihood of FDA approval. For example, Plaintiffs allege that Defendants omitted to disclose that the FDA had disagreed with the Trial's null hypothesis. Defendants' omissions of this critical information concerning the Trial is alleged to have been materially misleading because Defendants concealed or wholly omitted significant material information that, if disclosed, would have significantly altered the total mix of information available to investors.

### B.    Commencement of the Action and Appointment of Lead Plaintiff

17.    This Action was commenced on October 8, 2020, in the United States District Court for the Southern District of New York, in the case styled *Kristal v. Mesoblast Limited et al.*, 7:20-cv-08430-PMH. (ECF No. 1) Another action, *Mauskopf* v. *Mesoblast Limited et al.*, 1:20-cv-09111-PMH was filed in this Court on October 30, 2020, and was subsequently consolidated into the Action by Order of the Court on December 23, 2020. (ECF No. 25).

18.    On December 7, 2020, Frank Fayz filed a motion for appointment as lead plaintiff and approval of lead counsel. (ECF No. 5).

19.    Also on December 7, 2020, four movants or movant groups aside from Fayz filed

motions seeking appointment as lead plaintiff: Mordechai Vogel (ECF No. 7); Mohammed Al-Ostaz and Ahmed Elostath (ECF No. 10), Marc Percival (ECF No. 13), and Dieu Gregoriou (ECF No. 16.). Each of these movants later withdrew their lead plaintiff motions (ECF Nos. 16, 20, 22, 23).

20. On December 21, 2020, Fayz filed a notice of non-opposition to his appointment as lead plaintiff and approval of selection of lead counsel (ECF No. 24).

21. On December 23, 2020, the Court appointed Fayz as Lead Plaintiff and Rosen Law as Lead Counsel. (ECF No. 25).

### C. The Comprehensive Pre-Filing Investigation and Preparation of the Amended Complaint

22. Lead Counsel conduced a detailed independent investigation of Mesoblast and the alleged violations of the law in connection with researching, preparing, and drafting the Amended Complaint. This investigation included, among other things, a detailed review and analysis of: (i) Mesoblast's public SEC filings; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Mesoblast's investor calls; and (vi) other publicly available material and data, including FDA guidance documents and the FDA's and Mesoblast's briefing documents concerning Mesoblast's BLA for remestemcel-L to treat aGVHD as well as the transcript of the FDA advisory committee meeting on Mesoblast's BLA. In addition, Lead Counsel consulted with an FDA expert concerning the technical aspects of the claims from an FDA regulatory perspective.

23. On August 13, 2021, Plaintiffs filed an 85-page Amended Complaint based on their thorough investigation. (ECF No. 51). As set forth above, the Amended Complaint alleges that Defendants made materially false and misleading statements and omitted material information about the Mesoblast's clinical trial and BLA for rememsemcel-L, and misled investors about the

Company's prospects for FDA approval of the BLA based on the Trial.

**D.      Defendants' Pre-Motion to Dismiss Letter and the Court's Pre-Motion to Dismiss Conference**

24.      On September 7, 2021, pursuant to the Court's Individual Rules, Defendants sent Plaintiffs a pre-motion to dismiss letter setting out the reasons why the Complaint failed to state a claim and Plaintiffs sent Defendants a response thereto on September 14, 2021.

25.      On October 1, 2021, Defendants filed their pre-motion letter to dismiss with the Court setting out the reasons why the Complaint failed to state a claim (ECF No. 62), and Plaintiffs filed their response thereto on October 7, 2021 (ECF No. 64).  In their pre-motion dismiss letter, Defendants argued the Amended Complaint should be dismissed because: (i) Plaintiffs failed to allege (a) any actionable misrepresentations or omissions; (b) scienter; or (c) loss causation; and (ii) Plaintiffs failed to plead a control person claim.

26.      On December 21, 2021, the Court held a telephonic pre-motion to dismiss conference that counsel for Plaintiffs and Defendants attended. The same day, the Court entered a Minute Entry granting Defendants' leave to file a motion to dismiss, setting deadlines of February 9, 2022, April 11, 2022, and May 26, 2022 for Defendants' motion to dismiss, Plaintiffs' opposition brief, and Defendants' reply brief, respectively.

**E.      Settlement Negotiations and the Settlement's Preliminary Approval**

27.      Shortly after the Court's pre-motion dismiss conference, the Parties began settlement negotiations and agreed to schedule a mediation with a private mediator.

28.      On February 2, 2022, the Parties attended a mediation with retired federal judge Hon. Gary Feess of Phillips ADR.  Prior to the mediation, the Parties exchanged detailed mediation statements with numerous exhibits that were also submitted to Judge Feess. After a full-day mediation and extensive, hard-fought negotiations with the assistance of Judge Feess, the Parties

reached an agreement-in-principle to settle the Action and executed a term sheet (the "Term Sheet") setting forth the principle terms of the settlement on February 3, 2022. The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $2,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers. Attached as Exhibit 3 is the Declaration of Gary Feess in Support of Motion for Final Approval of Settlement ("Feess Decl.") attesting to the arms'-length nature of the negotiations leading to the Settlement.

29.    On February 9, 2022, the Parties jointly filed a letter motion requesting that the Court stay all deadlines in the Action in light of the Parties reaching a settlement agreement in principle to allow the Parties to negotiate and finalize the settlement papers (ECF No 68).  On February 10, 2022, the Court adjourned all deadlines in the case and ordered the Parties to file preliminary approval and notice documents with the Court by March 28, 2022 (ECF No. 69).

30.    Thereafter, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation on March 28, 2022.

31.    On March 28, 2022, Plaintiffs filed their Unopposed Motion for Entry of Order Preliminarily Approving Settlement and Establishing Notice Procedures (the "Preliminary Approval Motion"), and accompanying documents.  (ECF Nos. 71-74).

32.    On April 8, 2022, the Court entered the Preliminary Approval Order, which preliminary approved the Settlement, certified the Settlement Class for settlement purposes only, appointed Plaintiffs as class representatives, and appointed Lead Counsel as class counsel and set a date for the Final Approval Hearing. (ECF No. 75). The Preliminary Approval Order also appointed SCS as Claims Administrator, approved the form and content of the Notice, the Claim

9

Form, the Summary Notice, and Postcard Notice, and directed dissemination of the Postcard

Notice. *Id.*

33. The certified Settlement Class is defined as follows:

All persons or entities who purchased or otherwise acquired Mesoblast publicly
traded ADS between December 13, 2018 and October 2, 2020 and who held such
shares on August 11, 2020 and/or October 2, 2020 and who were damaged thereby.

Preliminary Approval Order ¶1.

34. The Court scheduled the Final Approval Hearing for August 15, 2022, at 11:00 a.m.

*Id.* ¶5.

35. Defendants have paid $2,000,000 into the Escrow Account for the benefit of the

Settlement Class.

## III.    THE RISKS OF CONTINUED LITIGATION

36. The Settlement provides an immediate and certain benefit to the Class in the form

of a non-reversionary cash payment of $2,000,000.  As explained more fully below, Plaintiffs and

Lead Counsel strongly believe that the claims asserted in this Action are meritorious and that the

evidence developed to date supports them, they recognize and acknowledge the substantial

expense and duration of continued proceedings that would be necessary to prosecute the Action.

Plaintiffs and Lead Counsel are also mindful of the inherent difficulty of proving claims under the

federal securities laws and the possible defenses to the claims asserted in this Action, as well as

the uncertainties presented by complex litigation. Prior to trial and appeal, the most immediate

risks faced by the Settlement Class related to Defendants' anticipated motion to dismiss. Thus,

there was no guarantee that Plaintiffs and the Class would later achieve any recovery, let alone one

greater than $2,000,000.

### A.    Risks Defendants' Anticipated Motion to Dismiss Posed

37. Defendants' anticipated motion to dismiss was due to be filed just one week after

the mediation. Defendants previewed the arguments they would have asserted in their pre-motion to dismiss letter filed with the Court and during the Court's pre-motion to dismiss conference. Defendants intended to raise a number of arguments in their anticipated motion to dismiss, which, if accepted by the Court, would have resulted in their dismissal from the case or dismissal of the Action entirely. For example, Defendants argued that many of the challenged statements are forward-looking under 15 U.S.C. §§78u-5(c)(2) & (3) and were accompanied by meaningful cautionary language warning investors of the risks involved with seeking FDA approval. Defendants also argued that many of the statements are subjective, non-actionable opinions about Mesoblast's trial methodology and implications of results. Further, Defendants disputed, among other things, that any of the alleged misstatements were materially false or misleading and that any of the Defendants acted with scienter. Whether Plaintiffs would have prevailed in response to these, and other, arguments at the pleading stage was far from certain. There was a very real risk that the Court could have granted Defendants' anticipated motion, especially in light of the strict pleading standards of the PSLRA.

**B.     Risks Faced in Obtaining and Maintaining Class Action Status**

38.     Even assuming that Plaintiffs successfully defeated Defendants' motion to dismiss, Defendants would have also argued against class certification. While Lead Counsel researched and analyzed the class question and are confident that all of the Rule 23 requirements would have been met, Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification.

39.     Moreover, even if Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f)'s interlocutory appeal provision, further delaying or precluding any potential recovery in the Action. Indeed, Lead Counsel had a class certified in a

11

securities class action (*see Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331 (D.N.J. 2018)) in February 2018, only to have the Third Circuit grant defendants' 23(f) petition. Although, plaintiffs prevailed before the Third Circuit, the case was on appeal for approximately 15 months. *See Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 Fed. Appx. 51 (3d Cir. May 30, 2019). Class certification of the instant Action was certainly not a forgone conclusion, and it could well have resulted in severe delays to any potential resolution of the case.

### C.    Risks to Proving Liability

40.    In addition to the hurdle of obtaining discovery and class action status, Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability. Defendants forcefully argued in their pre-motion to dismiss letter—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the elements of their Exchange Act claims.

41.    For instance, Defendants strenuously argued, and would continue to argue, that their statements concerning the BLA were opinions and statements of corporate optimism that were based on genuinely held beliefs and that the FDA's comments were merely tantamount to interim feedback, which Defendants were not required to disclose. Although Plaintiffs believe they could prove otherwise, discovery may have revealed that the FDA provided Defendants with information that provided them with a basis to believe that there was a high likelihood that the FDA would approve the BLA. As Defendants pointed out in their pre-motion to dismiss letter, the Oncologic Drugs and Advisory Committee of the FDA did vote in favor of approving the BLA. (ECF No. 62, p. 3).

42.    Defendants undoubtedly would have also continued firmly to contest their scienter. While Plaintiffs had a good faith basis to allege that Defendants knew about the FDA's admonitions concerning the Trial's design, were motivated to commit fraud to be able to continue

to raise financing, among other things, and acted recklessly in failing to disclose the FDA's stated concerns, discovery on this issue may have established negligence, and fallen short of establishing extreme recklessness. In other words, discovery may have revealed that Defendants lacked the requisite scienter, *i.e.*, that they had an honest good faith belief that remestemcel-L would gain FDA approval and that they did not believe that the FDA's stated concerns posed an unreasonably high risk of FDA non-approval.

43.    Although Plaintiffs believe they had strong arguments in response to Defendants' arguments, Defendants' contentions nevertheless posed significant risks to establishing liability had the litigation continued. Indeed, despite believing that this Action is meritorious Plaintiffs and Lead Counsel were well aware of the high hurdles they would have to surmount in order to successfully prove that Defendants actually violated the Exchange Act.

### D.    Risks to Proving Damages

44.    Even assuming Plaintiffs successfully defeated Defendants' anticipated motion to dismiss and surmounted all the other legal and factual obstacles to successfully establish liability, Plaintiffs would still face considerable risks in establishing loss causation and damages.  Proving loss causation and damages relies on expert testimony and is complicated in its own right.

45.    It is Plaintiffs' burden to establish loss causation and damages, and Plaintiffs must distinguish the alleged fraud from the tangle of other factors that affect a stock's price. Plaintiffs' expert would produce a trading model which would have to account for general market and industry conditions and isolate the impact of Defendants' false statements, as opposed to other news disclosed at the same time. Defendants' expert and fact witnesses would challenge Plaintiffs' expert. If the jury credited Defendants' expert in full, it would likely return a verdict against Plaintiffs for failure to prove damages. If the jury partially credited Defendants' expert, it may award less than the $2,000,000 available to the Settlement Class right now.  The inevitable "battle

13

of the experts" at class certification, summary judgment, and trial creates substantial litigation risk because there can be no assurance as to which party's expert the trier of fact will find more persuasive. Lead Counsel recognized the possibility that the jury could have been swayed by Defendants' experts and awarded little to no damages. In short, this case was far from a "slam dunk."

### E.    Other Risks, Including Trial and Appeals

46.    Plaintiffs would also have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one. Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

47.    Even if Plaintiffs had succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed all the risks faced by Plaintiffs—as Defendants would have reasserted all their arguments summarized above—but also would have resulted in significant additional delay. Given these significant litigation risks, Plaintiffs and Lead Counsel believe that the Settlement represents an excellent result for the Class.

### F.    The Settlement is Reasonable in Light of Potential Recovery in the Action

48.    In contrast to the foregoing, the Settlement provides an immediate and certain benefit to the Settlement Class in the form a non-revisionary cash payment of $2,000,000. Plaintiffs' damages expert estimates, that if Plaintiffs had fully prevailed on their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Lead Plaintiffs' ***best-case scenario***—the total ***maximum*** damages ***potentially*** available in this Action would be between approximately $55.4 million and approximately $74.3 million. Thus, the

14

$2,000,000 Settlement Amount represents between 2.7% and 3.7% of the total *maximum* damages *potentially* available in this Action.  However, Defendants could have raised credible arguments with respect to confounding information on each of the Amended Complaint's alleged disclosure dates which would have reduced damages.

49.    A recovery of 2.7% - 3.7% of maximum recoverable damages is well-within the range of reasonableness.  *See* NERA Report, Ex. 2. Notably, the recovery for the Settlement Class is between approximately 1.5 to 2 times greater than the 1.8% median percentage return for securities class action settlements in 2021. Consequently, the amount recovered by Plaintiffs, when balanced against the risks of continued litigation, weighs strongly in favor of final approval.

50.    Having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and considering the very real risks presented by Defendants' anticipated motion to dismiss, class certification, summary judgment, trial, and any eventual appeals that would have arisen, it is my belief, based upon all of the proceedings to date and my extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

## IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING DISSEMINATION OF NOTICE

51.    The Court's Preliminary Approval Order directed that the Postcard Notice be disseminated to the Settlement Class and set a final fairness hearing date of August 15, 2022 (the "Final Approval Hearing").  The Preliminary Approval Order also set a deadline of July 25, 2022 for: (a) filing objections to the Settlement, Plan of Allocation and/or the application for attorneys' fees and expenses; or (b) requesting exclusion from the Settlement Class.

52.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and

to publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed SCS to post downloadable copies of the Notice, Stipulation, Preliminary Approval Order and Claim Form online at strategicclaims.net/mesoblast (the "Settlement Website"). Upon request, SCS mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

53.    The Postcard Notice provides a limited description of the Settlement and directs potential Settlement Class Members to downloadable versions of the Notice and Claim Form posted online on the Settlement Website. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the application for attorneys' fees and expenses, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $50,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Plaintiffs, directly related to their representation of the Settlement Class.

54.    To date, 51,130 potential Settlement Class Members were notified of the Settlement by either mailed Postcard Notice or emailed a direct link of the Notice and Claim Form. Bravata Decl. ¶8.

55.    SCS mailed 29,398 Postcard Notices to potential Settlement Class Members. *Id*. at ¶6. To disseminate the Postcard Notice, SCS obtained from Defendants' Counsel, the names and addresses of record holders of Mesoblast ADSs that are potential Settlement Class Members. SCS

16

mailed Postcard Notices to the two individuals or organizations identified in Mesoblast's transfer records. *Id.* at ¶5. SCS also received 23,084 additional names and addresses for potential Settlement Class Members, requesting that SCS mail them a Postcard Notice. *Id.* at ¶6. Additionally, SCS received 6,231 requests from nominees for copies of Postcard Notices so the nominees could send it directly to their customers. *Id.* SCS was also notified that two nominees mailed the Postcard Notice to 81 of their customers. *See* Ex. 1, Bravata Decl. ¶¶5-6. Upon request, SCS also mailed 37 potential Settlement Class Members copies of the Notice and Claim Form. *Id.* at ¶6 n.2.

56.    A nominee informed SCS that it emailed 21,732 of their clients to notify them of the Settlement and provided a direct link to the Notice and Claim Form in the email. *See id.* at ¶7

57.    In addition, SCS maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees. *See id.* at ¶4. At the time of the initial mailing, SCS's proprietary master mailing list consisted of 879 banks and brokerage companies, as well as 1,049 mutual funds, insurance companies, pension funds, and money managers. *Id.* On May 5, 2022, SCS caused a letter to be sent by First-Class Mail or e-mailed to the 1,928 nominees contained in the SCS master mailing list. *Id.* The letter notified the nominees of the Settlement and requested that, within 7 calendar days from the date of the letter, they either send a Postcard Notice to their customers who may be beneficial purchasers/owners, or provide SCS with a list of names, mailing addresses and email addresses of such beneficial owners so that SCS could promptly mail the Postcard Notice to them. *Id.*; Ex. B (nominee letter).

58.    On May 23, 2022, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over *GlobeNewswire*. *See id.* at ¶11; Ex .D.

17

59.     Lead Counsel also caused SCS to establish the dedicated Settlement Website, which became operational on April 28, 2022 to provide potential Settlement Class Members with information concerning the Settlement, submit a claim online, download copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Postcard Notice. *Id.* at ¶13.

60.     The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the application for attorneys' fees and expenses, or to request exclusion from the Settlement Class is July 25, 2022.  To date, SCS has received one inquiry requesting further instructions on how to request exclusion and one purported request for exclusion. The individual requesting exclusion purchased 139 Mesoblast ADSs on September 2, 2020 and sold those ADSs on September 3, 2020. Bravata Dec. Exh. E. These 139 Mesoblast ADS's represent a tiny fraction of a percent of the total 13.2 million estimated damaged ADSs in the Settlement Class. *Id.* SCS will file a supplemental affidavit after the deadline addressing whether any additional requests for exclusion have been received.  To date, no objection to the Settlement, the Plan of Allocation, or the application for attorneys' fees and expenses has been entered on this Court's docket, or has otherwise been received by Lead Counsel.  Lead Counsel will file reply papers by August 7, 2022 that will address any objections that may be received.

## V.     THE PLAN OF ALLOCATION SHOULD BE APPROVED AS FAIR AND REASONABLE

61.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $2,000,000 Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Plaintiffs for their costs and expenses incurred in

18

representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information submitted online or postmarked no later than August 7, 2022. *See* Ex. 1, Bravata Decl. Ex. C (Notice ¶¶ 36, 42). The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to approval by the Court.

62.     The Plan of Allocation is detailed in the long-form Notice. Bravata Decl. Ex. C (Notice, pp. 10-14). The Notice is posted online at: https://www.strategicclaims.net/wp-content/uploads/2022/04/Mesoblast-Final-Long-Notice-andClaim.pdf, is downloadable, and upon request, will be mailed to any potential Settlement Class Members. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry, or Company-specific factors or factors unrelated to the alleged violations of law. The Plan of Allocation takes into consideration when each Authorized Claimant purchased and/or sold Mesoblast ADSs, the prices at which they purchased or sold, and whether they held over a disclosure date. *See* Ex. 1, Bravata Decl. Ex. C (Notice at ¶¶48-50). As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.*

63.     The proposed Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that

Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Mesoblast's ADSs was artificially inflated during the Settlement Class Period due to Defendants' alleged false and materially misleading statements and material omissions. The Plan of Allocation also incorporates the premise that the decrease in the price or value of Mesoblast ADSs following the alleged corrective disclosures may be used to measure the alleged artificial inflation in the price of Mesoblast ADSs prior to these disclosures. *See id.*

64.     Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶54.

65.     An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including the number of valid claims filed by other Claimants and how many Mesoblast ADSs the Claimant purchased or sold during the Settlement Class Period and when that Claimant bought or sold the ADSs. If a Claimant has an overall market *gain* with respect to his, her, or its overall transactions in Mesoblast ADSs during the Settlement Class Period, or did not hold any Mesoblast ADSs through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. *Id.* at ¶¶50, 58. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

66.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Mesoblast ADSs that were attributable to the conduct alleged in the Amended Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

67.     As noted above, as of July 11, 2022, approximately 51,130 potential Settlement Class Members were notified of the Settlement either by Postcard Notice, which directs Settlement Class Members to the Settlement Website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, or by receiving an email with a link to the Notice and Claim Form. *See* Ex. 1, Bravata Decl. at ¶¶6-8; Ex. A (Postcard Notice) C (Notice and Claim Form). To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket and there has been only one request for exclusion. *Id*. at ¶¶14-15.

## VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

68.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of one-third of the Settlement Fund (or $666,667, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also requests reimbursement of expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $22,670.50. Lead Counsel further request an award to Lead Plaintiff and additional Named Plaintiff in the total amount of $2,000 ($1,000 each) for the time they expended directly related to their representation of the Settlement Class pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4). The total Litigation Expenses amount of $24,670.50 is well below the maximum expense amount of $50,000 set forth in the Notices. The legal authorities

21

supporting the requested fees and expenses are set forth in the accompanying Fee Memorandum. The primary factual bases for the requested fees and expenses are summarized below.

### A. The Fee Application

69. Lead Counsel has represented the Settlement Class on a wholly contingent basis, not receiving any payment for their service or the expenses incurred in prosecuting this Action against Defendants and negotiating the Settlement without any guarantee of success. For their efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. The Postcard Notice and Notice informed Settlement Class Members that Lead Counsel would apply for attorneys' fees in an amount up to one-third ($33^{1/}_{3}\%$) of the Settlement Fund, plus reimbursement of expenses up to $50,000, which may include awards to Plaintiffs.

70. As discussed in the Fee Memorandum filed concurrently herewith, the trend in the Second Circuit is to use the percentage-of-fund method in determining the appropriate fee recovery as it directly aligns the interests of the class and counsel, incentivizing efficient prosecution and early resolution of litigation. It is also supported by the Supreme Court and the PSLRA.

71. The requested fee is within the range of reasonable fees awarded in common-fund cases in the Second Circuit. Based on the time and labor expended by Lead Counsel, the risks and complexities of the litigation, the quality of representation, the results achieved, and the contingent nature of the representation, I respectfully submit that the requested fee award is fair and reasonable and should be approved by the Court.

### 1. The Excellent Outcome Achieved is the Result of the Significant Time and Labor Lead Counsel Devoted to the Action

72. Lead Counsel has expended substantial time and effort pursuing this litigation and achieving the Settlement. Prior to reaching the agreement in principle to settle the Action, Lead

Counsel conducted an extensive investigation and analysis of the allegations in preparing the Amended Complaint, which included, *inter alia*: (a) a detailed review and analysis of Mesoblast's SEC filings, press releases, conference call transcripts, analyst reports, news reports, and other public information; (b) reviewing FDA briefing documents, and the Trial protocols; (c) consulting an FDA expert on industry specific issues and FDA regulatory procedure and practice; and (d) consulting with damages experts. Lead Counsel also conducted extensive legal research and analysis in connection with filing a response to Defendants' pre-motion to dismiss letter and prepared for and attended the Court's pre-motion to dismiss conference. Lead Counsel expended considerable time drafting a detailed mediation statement, reviewing and analyzing Defendants' mediation statement and attending the mediation during which Lead Counsel negotiated in good faith and at arms-length in order to obtain a favorable result for the Settlement Class.

73.     Subsequent to the mediation and execution of the Term Sheet, Lead Counsel negotiated the final settlement terms and drafted and finalized the settlement documents. Lead Counsel also consulted with an expert regarding the Plan the Allocation and prepared the documents required for preliminary and final approval of the Settlement. Lead Counsel will continue to expend necessary time and resources in ensuring the finalization of the claims process.

74.     In total, Lead Counsel expended a combined 666 hours prosecuting this Action, equating to a total lodestar of $539,491.50, as summarized in the chart below:

23

| Professional (position)* | Years Practiced | Hourly Rate | Hours Worked | Lodestar |
|---|---|---|---|---|
| Laurence M. Rosen (P) | 34 | $1,100.00 | 48.45 | $53,295.00 |
| Phillip Kim (P) | 20 | $975.00 | 4.1 | $3,997.50 |
| Sara Fuks (P) | 17 | $795.00 | 578.1 | $459,589.50 |
| Erica Stone (A) | 9 | $675.00 | 22.89 | $15,450.75 |
| Scott Kim (A) | 5 | $575.00 | 11.7 | $6,727.50 |
| Ryan Hedrick (A) | 3 | $575.00 | 0.75 | $431.25 |
| **TOTAL** | | | **665.99** | **$539,491.50** |

* Partner (P), Associate (A)

75.     The above chart contains the hours expended and corresponding lodestar amounts from the inception of the case through and including July 10, 2022. Time spent preparing the application for fees and reimbursement of expenses has not been included.

76.     The requested fee of one-third of the Settlement Fund equals $666,667 (plus interest), and therefore represents a multiplier of 1.24 to Lead Counsel's lodestar. As discussed in further detail in the Fee Memorandum, the multiplier on counsel's lodestar is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk.  Lead Counsel's rates range from $795 to $1,100 for partners, and $575 to $675 for associates, and are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude.  Exhibit 4 (chart of rates charged by peer plaintiff and defense counsel in complex litigation).

77.     The expertise and experience of counsel is an important factor to be weighed in assessing a fair fee. As demonstrated by Lead Counsel's firm resume, attached as Exhibit 5, Plaintiffs and the Settlement Class are being represented by experienced and skilled practitioners in the securities litigation field.

78.     Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances

such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2.    The Magnitude and Complexity of the Action

79.    As detailed in the Fee Memorandum, securities class action cases are known for their notorious complexity. This case was no different. As detailed above, this Action presented numerous complex issues, including the need for Lead Counsel to understand and research matters of, among other things, FDA policy and procedure and clinical trial design. This required working with an FDA expert on these industry-specific practices and translating that knowledge into the allegations of the Amended Complaint.  Despite the Amended Complaint's extensive detailed and particularized allegations, Defendants' pre-motion to dismiss letter attacked the foundation of these allegations, and if the Action had not settled, the litigation would have undoubtedly continued in a hotly contested motion to dismiss battle.

80.    Moreover, the settlement process in this Action was hard-fought. Both sides zealously advocated their positions during an all-day mediation before an experienced professional mediator and retired federal judge before the Parties agreed on the terms set forth in the Term Sheet.

### 3.    The Significant Risks Borne By Lead Counsel

81.    Lead Counsel undertook representation of Plaintiffs and the Settlement Class on a wholly contingent basis. Counsel knew from the outset that they would expend a substantial amount of time prosecuting this Action yet receive no compensation if the Action ultimately proved unsuccessful. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to

25

conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action, and incurred $22,670.50 in out-of-pocket litigation-related expenses in prosecuting the Action.

82.    Lead Counsel also bore the risk that no recovery would be achieved. As described above, this Action involved serious legal and practical hurdles that could have resulted in no recovery at all. Continued litigation would have entailed significant risks to the Settlement Class, as the Action could be derailed in any number of ways before a final judgment in Plaintiffs' favor was entered (and withstood possible appeal).

83.    Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels. As a result of consistent and persistent efforts in the face of substantial risks and uncertainties, Lead Counsel achieved a significant recovery for the benefit of the Settlement Class.

> **4.    The Quality of Representation, Including the Result Obtained, The Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel**

84.    As demonstrated by Lead Counsel's firm resume, Ex. 5, Lead Counsel is a highly experienced and skilled law firm that focus its practices on securities class action litigation. Indeed, Lead Counsel has substantial experience in litigating securities fraud class actions and has negotiated scores of other class settlements that have been approved by courts throughout the country.  Lead Counsel enjoys a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters.  I believe Lead Counsel's experience added valuable leverage in the settlement negotiations.

26

85. Lead Counsel also obtained an excellent result for the Class, as the Settlement is between approximately 1.5 and two times greater than the 1.8% median percentage return for securities class action settlements in 2021. *See* NERA Report, Ex. 2.

86. The quality of the work performed by counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants were represented by experienced and qualified attorneys well-versed in securities litigation at Wilson Sonsini Goodrich & Rosati P.C. In the face of this knowledgeable and formidable opposition, Lead Counsel was nevertheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Settlement Class.

### 5. The Requested Fee In Relation to the Settlement

87. The amount of the fee requested ($33^{1/}{}_{3}\%$) in relation to the Settlement Amount ($2,000,000) is fair and reasonable. Courts routinely award fees of one-third in securities class action settlements. *See* Fee Memorandum at III C. 1.

### 6. Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

88. Courts have consistently recognized that it is in the public's interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As Congress recognized through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly large investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts need to award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who

27

bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7. The Reaction of the Settlement Class Supports Lead Counsel's Fee Request

89.     As discussed above, 51,130 potential Settlement Class Members were notified of the Settlement and request for attorneys' fees up to one-third of the Settlement Amount and Litigation Expenses up to $50,000 either by mailed Postcard Notice (29,398 potential Settlement Class Members) or emailed a direct link to the Notice and Claim Form (21,732 potential Settlement Class Members). Ex. 1, Bravata Decl. at ¶8.  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over *GlobeNewswire*. Ex. 1, Bravata Decl. at ¶11; Ex. D (confirmation of Summary Notice publication). As of the date of this filing, there have been no objections to the proposed fee award. Any objection received after the date of this filing will be addressed in Lead Counsel's reply papers, which are to be filed by August 7, 2022.

### 8. Lead and Named Plaintiffs Support Lead Counsel's Fee Request

90.     As set forth in the declarations submitted by Lead Plaintiff Fayz and Named Plaintiff Caudle, attached hereto as Exhibits 6 and 7, respectively, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Class, and the risks of the Action. *See* Ex. 6, Declaration of Frank Fayz ("Fayz Decl.") ¶12; Ex. 7, Declaration of David Caudle ("Caudle Decl.") ¶12. Plaintiffs have been intimately involved in this case, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

91.     In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of one-third equal to a multiplier of 1.24, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

**B.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable**

92.     Lead Counsel also seeks reimbursement from the Settlement Fund of $22,670.50 in Litigation Expenses that were reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action. The expenses are summarized in chart set forth below which identifies each category of expense, including mediation fees, expert fees, online research, photocopying, and postage expenses, and the amount incurred for each category.

93.     From the beginning of the case, Lead Counsel was aware that they might not recover their out-of-pocket expenses. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action. Accordingly, Lead Counsel was motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

94.     The expenses requested for reimbursement are reflected on the books and records maintained by both Lead Counsel, which is prepared from expense vouchers, check records, invoices and other source materials, and which accurately record the expenses incurred.

95.     The following is a breakdown by category of all expenses incurred by Lead Counsel:

| ITEM | AMOUNT |
|---|---|
| COURIER, POSTAGE & FEDEX | $223.49 |
| EXPERTS (FDA/DAMAGES) | $4,884.50 |
| ONLINE RESEARCH | $994.34 |
| PRESS RELEASES/NOTICE TO CLASS MEMBERS | $5,250.00 |
| SERVICE OF PROCESS | $318.17 |
| MEDIATION | $11,000.00 |
|  |  |
| **GRAND TOTAL** | **$22,670.50** |

96.     The Postcard Notice and Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of litigation expenses in an amount not to exceed $50,000, which may include an application for reimbursement of reasonable costs and expenses incurred by Plaintiffs directly related to their representation of the Settlement Class.  The total amount requested, $22,670.50 is below the maximum amount that Settlement Class Members were advised could be sought and, to date, no objection has been raised as to the maximum amount of the expenses as set forth in the Postcard Notice and Notice. If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

97.     Lead and Named Plaintiffs seek a collective award in the amount $2,000: $1,000 each to Lead Plaintiff Fayz and Named Plaintiffs Caudle. These awards are justified in light of their efforts in this Action.  Lead Plaintiffs: (a) regularly communicated with Lead Counsel regarding the posture and progress of the case; (b) provided counsel with information concerning their transactions in Mesoblast securities; (c) consulted with Lead Counsel regarding settlement negotiations; and (f) evaluated and approved the proposed Settlement of this case.  Messrs. Fayz and Caudle have both submitted declarations detailing their respective contributions to the case and the amount of time they spent dedicated to the Action. (*See* Exs. 6-7 hereto). Given the

important contributions and the time and effort expended by the Lead and Named Plaintiff, the requested awards are warranted and should be approved.

98.    In my opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

99.    In view of the significant recovery to the Settlement Class, the substantial risks of this litigation, the substantial efforts of Lead Counsel, the quality of the work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, Lead Counsel respectfully submits that the Settlement should be approved as fair, reasonable, and adequate; the Plan of Allocation should be approved as fair and reasonable; a fee in the amount of $33^{1/}_{3}$% of the $2,000,000 Settlement Fund, plus any accrued interest, should be awarded to Lead Counsel; and litigation expenses in the amount of $22,670.50,  including awards to Lead and Named Plaintiff of $1,000 each (making total expenses $24,670.50) should be reimbursed in full.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 11, 2022 in New York, New York.

*/s/ Sara E. Fuks*
Sara E. Fuks

31